STATE OF NEBRASKA, APPELLEE, V.
LEONDRE WALKER, APPELLANT.
724 N.W.2d 552

Filed December 8, 2006. No. S-05-753.

Kimberly K. Carbullido, of Cohen, Vacanti, Higgins & Shattuck, and, on brief, Timothy L. Ashford for appellant.

Leondre Walker, pro se.

Jon Bruning, Attorney General, and George R. Love for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ. and HANNON, Judge, Retired.

CONNOLLY, J.

Leondre Walker appeals his convictions for first degree murder, two counts of use of a deadly weapon to commit a felony, attempted murder in the second degree, and possession of a deadly weapon by a felon. The district court sentenced Walker to life imprisonment for the first degree murder, 40 to 50 years' imprisonment for attempted second degree murder, 40 to 50

years' imprisonment for each conviction of use of a deadly weapon to commit a felony, and 10 to 20 years' imprisonment for possession of a deadly weapon by a felon. The court ordered all the sentences to be served consecutively. We affirm.

## ASSIGNMENTS OF ERROR

Walker assigns the district court erred in (1) granting the prosecution's peremptory challenges to excuse four African-American jurors, (2) not suppressing Walker's confession, (3) allowing into evidence a victim's identification of Walker, (4) ruling Walker competent for trial, (5) allowing the prosecution to amend the charges to add additional charges which were prejudicial to Walker, (6) denying Walker's motion to dismiss his attorneys, (7) failing to find that his attorneys provided ineffective assistance, (8) finding the State had adduced sufficient evidence to sustain the convictions, and (9) imposing excessive sentences that run consecutively instead of concurrently.

## BACKGROUND

### CRIME

Barry Thompson, James Earl Carter, and another individual resided in an apartment in Omaha, Nebraska. On September 3, 2003, Thompson, Carter, and a friend of Thompson's were in the apartment. Answering a knock on the door, Thompson opened the door and Walker and two men entered. Walker pointed a gun at Thompson and Carter and told them, "This is a robbery. If you've got any money, take it out and put it on the table and then lay out on the floor." Thompson's friend put his money on the table, but Thompson and Carter did not have any. Before they could get to the floor, Walker shot and killed Carter and shot Thompson in the jaw. When the other resident entered the apartment, Walker picked up the money from the table and left.

### INVESTIGATION

At the scene, the police were told that a person by the nickname of "St. Louis" had been at the apartment during the shootings. Omaha police officer Christopher Perna combed through a gang file system and found that Walker's brother used the nickname of "St. Louis." On September 4, 2003, Walker's brother voluntarily came to the police station and Perna interviewed

him. Perna, however, did not arrest him because he had a confirmed alibi. The investigation then shifted to Walker.

### WALKER'S ADMISSION TO TOMMY BROWN AND DYWAN WILLIAMS

Walker was staying at the apartment of Tom Johnson and Tommy Brown. Walker told Brown that he had robbed and shot Carter because Carter owed him $200. Walker also showed Brown the gun that he used to commit the crimes. Once outside of Walker's presence, Brown called Crimestoppers.

While Brown called Crimestoppers, Dywan Williams, Carter's cousin, and Carnell Jimmerson, a friend of Williams, went to the apartment to confront Walker because Williams heard Walker had killed Carter. Finding Walker, Williams assaulted him, while Jimmerson took Walker's gun away. During the assault, Walker asked Williams why they were attacking him and Williams told Walker it was because Walker had killed his cousin. In response, Walker said that he did not know Carter was Williams' cousin and that if he had known, he would not have killed him.

Williams and Johnson then grabbed Walker and threw him out the door. Outside the apartment, several other people struck and kicked Walker. Meanwhile, Jimmerson put Walker's gun into a brown paper bag, placed the bag in front of the apartment, and told Williams where the bag was. When the police arrived, Williams told them the location of the gun. An officer retrieved a Sig Sauer .380-caliber semiautomatic pistol. The police later matched the two cartridges recovered from the crime scene to the pistol.

### WALKER'S ARREST AND CONFESSION

At about the same time the crowd was attacking Walker, police officers arrived. They observed several individuals attacking Walker on a stairway and one of the officers heard someone say, "He killed my brother." The officers broke up the attack.

When Det. Kenneth Kanger arrived, he asked Walker to go with him to police headquarters to talk about the shootings. Walker agreed and went with Kanger. Once at the police station, Kanger and Perna asked Walker about his family and background. After they covered this background information, they advised Walker of his *Miranda* rights and Walker responded

either verbally or by nodding his head that he understood each of these rights.

Kanger and Perna interviewed Walker on and off for about 4 hours 45 minutes. During the interview, the detectives offered Walker food, drink, cigarettes, and an opportunity to use the restroom. At no time did Walker request counsel, ask for the interview to be stopped, refuse to answer a specific question, or complain that he was tired. Walker eventually admitted to participating in the robbery and to shooting Thompson and Carter.

## ANALYSIS

### WALKER'S *BATSON* CHALLENGE FAILS BECAUSE STATE'S PEREMPTORY CHALLENGES ARE RACE NEUTRAL

Walker challenges the State's peremptory challenges for 4 of the 6 African-American jurors in the jury pool of 36. Walker alleges these challenges were based on race. The State, however, argues *Batson* requires Walker to prove a purposeful racial discrimination in the use of peremptory challenges, and it argues it dismissed the four African-American jurors for nonracial reasons. Also, the State points out the jury pool still contained two African-Americans.

Walker claims the court violated *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), in granting the prosecution's peremptory challenges to excuse four jurors. In *Batson*, the U.S. Supreme Court held that prosecutors are prohibited from using peremptory challenges to strike potential jurors solely because of their race.

In making his *Batson* challenge, Walker's lawyer asked the court to take judicial notice that Walker, an African-American, is a member of a cognizable racial group. He argued this raised an inference that the prosecutor used the challenges to exclude the four potential jurors based on their race.

In response, the prosecution asked the trial judge if Walker had met the first step of the *Batson* test by showing that the prosecutor had exercised the peremptory challenges based on race. The trial judge said, "My basic feeling is no, I don't. But I'm going to let you go ahead." The prosecution then articulated the following reasons: Juror No. 1 had a son who was a convicted felon and was serving time in prison. Juror No. 10's

employment concerned the prosecution because she worked as an administrator at an Omaha church. Juror No. 18 was inattentive and read other materials during voir dire. Juror No. 36 has an uncle who is a member of the Black Panthers and a convicted felon whom she has had direct contact with over the course of several years. After hearing these explanations, the judge determined that Walker had not proved purposeful discrimination and he overruled the *Batson* challenge.

■ The trial court's determination that a party's use of his or her peremptory challenges lacks purposeful discrimination is a factual determination which an appellate court will reverse only if clearly erroneous. See *State v. Lowe*, 267 Neb. 782, 677 N.W.2d 178 (2004).

■ To show that a prosecutor has used peremptory challenges in a racially discriminatory manner, a defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges because of race. If the defendant makes a prima facie showing, the prosecutor must then articulate a race-neutral explanation for striking the juror in question. *State v. Lowe, supra*. The prosecutor's explanation does not have to be persuasive or even plausible. In fact, the reasoning " 'may be "implausible or fantastic," even "silly or superstitious," and yet still be "legitimate." ' " *Gee v. Groose*, 110 F.3d 1346, 1351 (8th Cir. 1997). A legitimate reason does not need to make sense. *Purkett v. Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). Instead, it only has to be a reason that does not deny equal protection. *Id.* Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *State v. Lowe, supra*. In determining if the "real" reason was based on race, unless discriminatory intent is " 'inherent in the prosecutor's explanation, the reason offered [by the prosecution] will be deemed race neutral.' " *Purkett v. Elem*, 514 U.S. at 768.

In overcoming the *Batson* challenge, the State's explanations are similar to those we have previously found to be sufficient to satisfy *Batson*. In *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999), the prosecution used peremptory challenges to strike three African-American jurors. *State v. Myers, supra*. The State struck one juror because she was young and single,

and she might be attracted to the defendant. The State was also concerned because the juror lived in an area of high gang activity. The prosecution struck the second juror because she was unemployed, did not follow the court's instructions, and seemed to have a disagreeable attitude. The third juror was stricken because she was elderly and was inattentive. We concluded these reasons to be "sufficiently neutral to avoid reversal on a 'clearly erroneous' standard." *Id.* at 309, 603 N.W.2d at 386.

Here, jurors Nos. 1 and 36 had close family members who were convicted felons. The prosecution's concern that these jurors might sympathize with Walker is just as race neutral as the concern in *Myers* over the first juror developing a "crush" on the defendant and living in an area of high gang activity.

Although nothing in the record indicates juror No. 18 was elderly or disabled, the State had a valid concern about the juror's ability to be attentive because she was reading during voir dire.

Although it is not clear from the record why juror No. 10's employment at a church concerned the State, *Batson* does not demand the explanation for a peremptory strike to be persuasive or even plausible. See *Purkett v. Elem, supra.* The district court was not clearly erroneous in finding the prosecution's peremptory challenges did not violate *Batson.*

### WALKER UNDERSTOOD HIS *MIRANDA* RIGHTS

When questioned by Kanger and Perna, Walker confessed to participating in the robbery and to shooting Thompson and killing Carter. He argues that these statements were given in violation of his right to counsel and that thus, his confession was not freely and voluntarily given in violation of his 5th, 6th, and 14th Amendments to the U.S. Constitution and by article I, §§ 11 and 12, of the Nebraska Constitution.

Walker argues that his confession should have been suppressed because during the interview, he asked if statements he made would be used against him. He contends that this shows he did not understand his *Miranda* rights and that questioning should have ceased. He contends that it was only after he asked if his statements would be used against him that he admitted the crimes. He primarily relies on the following exchange during the interview:

[Perna]: No, no. Why'd you go over the house? To get the money? Or was it. . . . The truthful reason.

[Walker]: The truthful reason was. . . . You sure the *other stuff* won't be used against me, right?

Q: No. What stuff? The stuff that you originally told us?

A: Yeah. About the, the drug.

Q: Why? Now. . . . I'm not worried about the drug. We wanna know why. . . .

A: The reason why. Okay. And even pay me from last time.

Q: Okay.

A: I told him I'm gettin' 'em some drugs.

(Emphasis supplied.) The trial court found that Walker had voluntarily accompanied an Omaha police officer to police headquarters to talk about the events of September 3, 2003. [Walker] was read his <u>Miranda</u> rights, and verbally and physically acknowledged his understanding of those rights. [Walker] never asked for further clarification of those rights, never requested that he have counsel present, never refused to answer a specific question and never cut off questioning. Instead, [Walker] sat and talked with Perna and Kanger for over four hours and eventually confessed to shooting Carter and Thompson. . . . Because the record demonstrates that [Walker] understood his constitutional rights and voluntarily waived those rights, the Court finds that it cannot grant [Walker's] requested relief because [he] never invoked his right to remain silent.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates that its agents used procedural safeguards that are effective to secure the privilege against self-incrimination. See, *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006); *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003). *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. *State v. Ball, supra*. A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous. *State v. Williams*, 269 Neb. 917, 697 N.W.2d 273 (2005).

A valid *Miranda* waiver must be both " 'voluntary in the sense that it was the product of a free and deliberate choice' " and " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987). In determining whether a statement is voluntary, we apply a totality of the circumstances test. *State v. Williams, supra.* Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct. See, *White v. Massachusetts,* 382 F. Supp. 2d 248 (D. Mass. 2005) (citing *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)); *Toste v. Lopes*, 701 F. Supp. 306 (D. Conn. 1987).

Here, the police advised Walker of his *Miranda* rights, and he acknowledged that he understood those rights. He then waived those rights by not remaining silent or requesting a lawyer. Walker asked a question later during his interrogation, which he claims shows that he did not understand that what he said could be used against him. But, his statement could also be construed that he did understand his rights. When he asked, "You sure the *other stuff* won't be used against me, right?" he was referring to previous statements he had made regarding drugs. The trial court could reasonably infer that Walker was aware the information he provided regarding the murder would be used against him.

Moreover, other factors support a finding that Walker understood his *Miranda* rights. The record shows no indication that Walker's age or intelligence would hinder his understanding of his rights. Further, Walker is familiar with the criminal legal process, having been convicted of 30 crimes, including 11 felonies. His experiences with law enforcement bolster the trial court's determination that he was aware of his rights and understood the significance of waiving them. See, *United States v. Hall*, 724 F.2d 1055, 1059 (2d Cir. 1983) (noting that defendant was not " 'a newcomer to the law' " in determining whether he understood his rights, quoting *United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976)); *United States v. Isom*, 588 F.2d 858, 862 (2d Cir. 1978) (observing appellant's "rather considerable prior experience with law enforcement

officers" in upholding the trial court's ruling that he understood his rights). Based on the totality of the circumstances, the trial court was not clearly erroneous in finding that Walker understood his *Miranda* rights and knowingly waived them.

## PHOTOGRAPHIC ARRAY PROCEDURES

While still in the hospital, police showed Thompson a photographic array that contained six pictures of individuals that looked similar to Walker. In the photographic array, Thompson identified Walker as the man who shot him. The record shows that the police did not direct Thompson to any particular photograph or indicate that they suspected that anyone in the array was the one who shot him.

Walker argues that the district court erred in overruling his motion to suppress the pretrial identification because it was unduly suggestive. At trial, however, Walker failed to object to Thompson's identifying him as the man who shot him in the face and who killed Carter. After a pretrial hearing and order overruling a defendant's motion to suppress, the defendant, to preserve the issue on appeal, must object at trial to the admission of the evidence which was the subject of the suppression motion. See, *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995); *State v. Rodgers*, 237 Neb. 506, 466 N.W.2d 537 (1991). Walker failed to object to Thompson's identification and thus failed to preserve this issue on appeal.

## WALKER COMPETENT TO STAND TRIAL

Walker argues that the trial court erred in finding him competent to stand trial. On the first day of trial, the court granted a motion for a competency evaluation. In making this motion, Walker's counsel noted Walker's history of mental illness, the correspondences Walker had sent to the court, and discussions the defense lawyers had with Walker indicating an evaluation would be appropriate.

A psychiatrist with the Lincoln Regional Center concluded that Walker showed "no mental illness which would preclude the possibility of cooperating with his attorney in the preparation and presentation of a defense." Relying on this evaluation, the court found Walker competent to stand trial.

 A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her condition in reference to such proceedings, and to make a rational defense. *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999). The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. *State v. Jones*, 258 Neb. 695, 605 N.W.2d 434 (2000); *State v. Hittle, supra.* The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *Id.*

The psychiatrist's determination that Walker had the capacity to understand the nature and object of the proceedings against him and to comprehend such proceedings provided sufficient evidence to support the trial court's finding that Walker was competent to stand trial.

### Amendment of Information

Walker argues the district court erred when it allowed the State to amend the information. Four days before the trial started, the State moved to amend the information from first degree assault to attempted second degree murder and to add the charge of possession of a deadly weapon by a felon. The trial court allowed the amendment, finding that it did not prejudice Walker.

 Walker argues the trial court erred in granting this motion because the lateness of the additional charges were prejudicial to his case and required his attorney to conduct further investigation. Objections to the form or content of an information should be raised by a motion to quash. *State v. Al-Sayagh*, 268 Neb. 913, 689 N.W.2d 587 (2004). Walker failed to move to quash the information, and so he waives any objections to it. See *State v. Meers*, 257 Neb. 398, 598 N.W.2d 435 (1999).

### Request to Dismiss Attorneys

Before trial, the trial court considered Walker's motion to dismiss his counsel and appoint new counsel. Walker argued that his lawyers were unresponsive to his inquiries and did not keep him informed about his case and that he feared the public defender's office and the Omaha Police Department were working together against him. The court overruled this motion, noting

that Walker did not have any evidence to support his suspicions and concerns.

A trial court's decision to dismiss appointed counsel is reviewed for an abuse of discretion. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). Here, Walker presented no evidence to support his suspicions and concerns. The trial court did not abuse its discretion in overruling Walker's motion to dismiss.

### RECORD ON APPEAL IS INSUFFICIENT TO REACH WALKER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Walker argues he received ineffective assistance of counsel because the public defenders failed to adequately investigate and prepare his case, did not call particular witnesses, and did not present an alibi defense.

A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003). The determining factor is whether the record is sufficient to adequately review the question. *Id.* If a matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.* See, also, *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

Here, each of Walker's claims assert that it was trial counsel's omission to do something which rendered trial counsel ineffective. The reasons for these claimed omissions would require an evaluation of trial strategy and of matters not contained in the record. We conclude that the record is not sufficient to adequately review Walker's claim of ineffective assistance of counsel.

### EVIDENCE WAS SUFFICIENT TO SUPPORT CONVICTIONS

Walker claims the State failed to present sufficient evidence to convict him. Walker argues (1) there were conflicting eyewitness accounts, (2) Thompson's identification of Walker was unduly suggestive, and (3) Walker's fingerprints were not on the gun. From this, he argues the evidence presented at trial lacked sufficient probative value as a matter of law to convict him.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question

for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005). In making this determination, the court should not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, as these matters are for the finder of fact. See *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

Stating the obvious, the State adduced sufficient evidence beyond a reasonable doubt that a rational juror could find Walker guilty: Walker confessed to the murder of Carter and to the shooting of Thompson; Thompson testified that it was Walker who shot him in the face and killed Carter, and Walker admitted to Brown and Williams that he committed the robbery and shot Carter; and Walker's gun fired the two cartridge cases recovered at the scene.

### Excessive Sentences

Walker argues his sentences were excessive and that the sentences should run concurrently.

Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Moyer*, 271 Neb. 776, 715 N.W.2d 565 (2006).

The sentences fall within the statutory limits, and the trial court did not abuse its discretion in imposing the sentences.

### CONCLUSION

The trial court did not err in granting the prosecution's peremptory challenges, allowing Thompson's identification of Walker and Walker's confession into evidence, ruling Walker competent for trial, allowing the prosecution to amend the charges, or denying Walker's motion to dismiss his attorneys. The sentences imposed by the trial court were not excessive, and

the evidence was sufficient to sustain the convictions. Walker's convictions and sentences are affirmed.

AFFIRMED.

HEAVICAN, C.J., not participating.